Perry S. McKAY and Charles
C. McKay, Plaintiffs–
Appellants,

v.

UNITED STATES, Defendant–Appellee.

No. 98–5125.

United States Court of Appeals,
Federal Circuit.

Dec. 21, 1999.

Holly I. Holder, Holly I. Holder, PC, of Denver Colorado, argued for plaintiffs-appellants.

Ethan G. Shenkman, Attorney, Appellate Section, Environment and Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were Lois J. Schiffer, Assistant Attorney General; David C. Shilton and Michael K. Martin, Attorneys. Of counsel was Thornton W. Field, General Litigation Section.

Before MICHEL, PLAGER, and RADER, Circuit Judges.

PLAGER, Circuit Judge.

Perry McKay and Charles S. McKay ("the McKays") sued the United States

("the Government") in the Court of Federal Claims for a Taking under the Fifth Amendment of the United States Constitution. *See McKay v. United States*, No. 94–580L (Fed.Cl. Apr. 8, 1998). The trial court granted summary judgment of no liability to the Government. Because the Court of Federal Claims did not properly draw all reasonable inferences for and view the facts in the light most favorable to the non-movant, the McKays, and because when that is done there are genuine issues of material fact in dispute, we reverse the grant of summary judgment and remand for further proceedings in accordance with this opinion.

## BACKGROUND

### 1.

Perry McKay and Charles McKay each owned a fifty percent interest in 227 acres of land adjoining the Department of Energy's ("DOE") Rocky Flats Environmental Technology Site ("Rocky Flats"), a nuclear weapons research and production facility. The McKays had a clay mine on that land and had plans to mine gravel there as well.

In response to the Government's initiative to expand the buffer zone surrounding Rocky Flats, the McKays granted the surface rights of their land to the Government in the mid–1970s. The McKays explicitly reserved the mineral interests underlying the 227 acres of land and obtained "special exception" mining permits in 1979 and 1987 from the local government, the Jefferson County Board of Adjustment ("Board"). In furtherance of their mining interests, the McKays entered into a mineral lease in 1990 with Western Aggregates, Inc. that provided the McKays would receive a minimum of $100,000 in annual payments, plus royalties on all materials mined.

Unbeknownst to the McKays, from 1982 through 1985, DOE periodically sprayed effluence from their facilities onto a 94–acre tract, known as the West Spray Field, which was in that part of the buffer zone overlying the McKays' mineral estate. The sprayed waste was pumped from one of a complex of ponds that were used to hold waste water from several production buildings in Rocky Flats, or to hold runoff or leakage from the ponds.

In the mid to late 1980s, DOE took soil samples from the West Spray Field and conducted a study to assess potential contamination of the area. In a Closure Plan published in 1988, DOE stated that it had preliminarily concluded from its studies of soil samples from the West Spray Field that there were elevated levels of nitrates and volatile organic compounds in the soil. In the Closure Plan, DOE recommended that additional testing be done.

In January of 1991, DOE, the Environmental Protection Agency ("EPA") and the Colorado Department of Public Health and Environment ("CDH") entered into a Federal Facility Agreement and Consent Order ("Interagency Agreement") setting forth schedules and responsibilities for investigating and remediating any contamination at Rocky Flats. Under the Interagency Agreement, because of the uncertainty about the effect of past spraying activities, the West Spray Field was designated a "Hazardous Substance Site."

As part of the studies of the possible contamination of the West Spray Field, groundwater monitoring wells that extended into the McKays' mineral estate were installed on the West Spray Field, without the McKays' consent. The monitoring wells remained there for a period of years.

In May of 1991, a few months after the Interagency Agreement had been signed, David P. Simonson of DOE's Rocky Flats Office sent a letter (the "Simonson letter") to H. Bruce Humphries, the Mineral's Program Supervisor of the Mined Land Reclamation Division of the Department of Natural Resources in Denver, Colorado. The letter demanded that McKays' lessee, Western Aggregates, not interfere nor ag-

gravate the situation in the West Spray Field:

Our major concern is that Rocky Flats is currently a Superfund site. DOE entered into an interagency agreement with EPA and the Colorado Department of Health (CDH) in order to carry out investigation and remediation activities in compliance with applicable laws. *Obviously, we would like assurances that Western Aggregates' activities will not interfere with these activities nor aggravate the existing situation.*

(emphasis added). The Simonson letter was copied to the Jefferson County Board of Adjustment.

In June of 1991, a month after the Simonson letter was sent, the Jefferson County Board held a hearing to reconsider the McKays' 1987 special exception mining permit for areas underlying the West Spray Field. At the hearing, the Board resolved, *inter alia,* that:

Due to the existence of the spray field, no disturbance of the site shall occur (except for remedial action work performed by the Environmental Protection Agency or the Colorado Department of Health) until written evidence is presented at a public hearing which clearly demonstrations [sic] to the satisfaction of the Board of Adjustment that no hazards to human health or to the environment would be created by disturbance of the site.

Thus, the McKays' special exception to mine the area around Rocky Flats was reduced in size to exclude the area underlying the West Spray Field. As a result of the reduction in area allowed to be mined, Western Aggregates could not mine the 94 acres under the West Spray Field. Eventually, Western Aggregates terminated its lease with the McKays.

After four years of studies, the agencies released their conclusions from their investigations in a "Final Corrective Action Decision/Record of Decision OU11: West Spray Field" ("ROD"). The ROD stated that no remedial action was necessary for the West Spray Field and that mining of the site would not pose significant risk to human health or the environment.

2.

The McKays filed suit in the United States District Court for the District of Colorado against the United States and others, seeking tort damages and alleging an inverse condemnation claim against the United States. In August of 1994, the district court dismissed the tort claims and transferred the inverse condemnation claim to the Court of Federal Claims. *See McKay v. United States,* No. 93–B–1121 (D.Col. Aug. 26, 1994).

In the Court of Federal Claims, the McKays alleged a taking based on three theories: 1) that the effluence physically sprayed onto the West Spray Field contaminated their mineral interests underlying the Field; 2) that the installation of groundwater monitoring wells that extended into their mineral estate constituted a physical taking of their property; and 3) that the Board's reduction of the area of their mining permit, instigated by the Government, was a regulatory taking that deprived them of all economic value in their property.

After conducting some discovery, the McKays moved for summary judgment regarding their taking claims, and the Government filed a cross-motion for summary judgment of no liability. The Court of Federal Claims denied the McKays' motion and granted the Government's cross-motion.

In an April 8, 1998 opinion, the Court of Federal Claims discussed its reasons for concluding that all three of the McKays' taking allegations failed. *See McKay v. United States,* No. 94–580L (Fed.Cl. Apr. 8, 1998). As to the McKays' first allegation, the trial court concluded that the McKays had not provided any objective evidence that the minerals below the West Spray Field were contaminated to such a degree that a permanent physical occupa-

tion of their property had occurred. On the McKays' claim that groundwater monitoring wells installed on the West Spray Field constituted a physical taking, the trial court concluded that, according to Colorado law, the wells did not interfere with the use, possession, enjoyment or disposition of the McKays' mineral interests. On the McKays' third claim, that the Board's reduction in their mining permit amounted to a regulatory taking, the trial court concluded that there was no taking because the Board merely granted the McKays' voluntary request for a reduction. Concluding that all three of the McKays' claims failed, the trial court granted the Government's cross-motion for summary judgment of no liability.

## DISCUSSION

■ In reviewing a trial court's grant of summary judgment, we must make an independent determination as to whether the standards for summary judgment have been met. *See Conroy v. Reebok Int'l Ltd.,* 14 F.3d 1570, 1575, 29 U.S.P.Q.2d 1373, 1377; *Vas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1560, 19 U.S.P.Q.2d 1111, 1114 (Fed.Cir.1991); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,* 911 F.2d 670, 673, 15 U.S.P.Q.2d 1540, 1542–43 (Fed.Cir.1990). In considering whether summary judgment should have been granted, we view the evidence in a light most favorable to the non-movant and draw all reasonable inferences in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1116, 227 U.S.P.Q. 577, 581 (Fed.Cir.1985) (en banc). A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). When both parties move for summary judgment, each party's motion must be evaluated on its own merits and all reasonable inferences must be resolved against the party whose motion is

under consideration. *See Mingus Constrs., Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987).

### i. Contamination by Spraying

As an incident to its sovereignty, the Government has the authority to take private property for a public purpose. However, that authority is not without limitation. As it has for over two centuries, the Fifth Amendment of the United States Constitution concludes with the simple statement: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Thus, if the Government does take private property for public use, it must provide "just compensation" to the property owner.

The McKays contend that effluence sprayed by DOE contaminated their mineral estate, and that this contamination constitutes a taking, a physical taking, of their property. The evidence in the case which describes the condition of the soil of the West Spray Field consists of the 1988 Closure Plan that summarized the DOE's preliminary study of the Field, and the ROD that summarized studies done in the 1990s. Although the preliminary study conducted in 1988 indicated that there might be some soil contamination in the West Spray Field, that study emphasized the need for additional testing. At the conclusion of the additional studies done in the early 1990s, it was found and reported in the ROD that no contamination of the mineral estate underlying the West Spray Field had occurred.

■ The McKays did not submit any evidence to rebut the conclusions of the ROD. Instead, they contended that the Board's 1991 resolution is evidence of contamination of their mineral estate. The Board's resolution does, indeed, contain language that suggests that there was contamination: "That as a result of the use of the property as a spray field, monitoring shows that the groundwater is contaminated with nitrates, inorganic contaminants, and possible radionuclides." However, the

McKays conceded that the Board did not conduct any studies or testing on the West Spray Field but was relying upon the 1988 preliminary study.

As noted above, and undisputed by the McKays, although the preliminary study conducted in 1988 indicated that there might be some soil contamination in the West Spray Field, that study emphasized the need for additional testing. Therefore, the Board resolution could have done little more than acknowledge the possibility of contamination based upon the 1988 preliminary study. The Board could not make a finding of contamination, nor did it have before it the later studies done in the 1990s that concluded there was no contamination.

Because of the total absence of evidence supporting the McKays' claim for a taking due to contamination of the mineral estate underlying the West Spray Field from the spraying of effluence, the trial court correctly concluded that there was no genuine issue of material fact regarding the contamination of the McKay's mineral estate resulting from the spraying, and that the Government was without liability for any alleged contamination.

ii. The Groundwater Monitoring Wells

■ In addition to their claim for a taking due to the spraying of effluence onto the West Spray Field, the McKays claim a taking due to the installation on the West Spray Field of multiple groundwater monitoring wells that extended into their mineral estate and remained there for several years.

■ In *Hendler v. United States*, 952 F.2d 1364 (Fed.Cir.1991), a factually similar case involving the Government's placement of monitoring wells onto private property, we held that such an occupation amounted to a taking. "A physical occupation of private property by the Government which is adjudged to be of a permanent nature is a taking, and that is true without regard to whether the action

achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 1375. We further explained the temporal requirements for taking: "the concept of permanent physical occupation does not require that in every instance the occupation be exclusive, or continuous and uninterrupted." *Id.* at 1377.

In the case at hand, undisputed evidence indicated that the monitoring wells intruded into the McKays' mineral estate, that the wells were not temporary in nature, and that they remained there for several years. Clearly, there was evidence of a physical occupation by the Government of the McKays' property. In general, in the case of physical invasions, the Supreme Court has pointed out that "no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Even when the physical intrusion occupied less than one and one half cubic feet of space on a landowner's property, the Supreme Court has held that a taking was effected. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (holding that New York's law requiring landlords to allow television cable companies to place cable facilities in their apartment buildings constituted a taking even though the facilities occupied at most only 1½ cubic feet of the landlords' property).

■ Despite this undisputed evidence of a physical invasion of the McKays' mineral estate by the Government, the trial court concluded that no taking had occurred. Relying heavily on a Colorado case, *City of Northglenn v. Grynberg*, 846 P.2d 175 (Colo.1993), the trial court reasoned that Colorado state law allowed such interference into a mineral estate by a surface owner. The trial court was correct to look to Colorado law to determine if a there was a property right that could be violated, since the Fifth Amendment protects rather than creates property interests.

*See Board of Regents of Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (existence of a property interest is determined by reference to "existing rules or understandings that stem from an independent source such as state law"); *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

In the Colorado case on which the trial court relied, the surface estate and the mineral estate had been severed. The owner of the surface estate, the City of Northglenn, drilled a single well on the property to determine the nature of the underlying structure, prefatory to building a reservoir on the land. The owner of the mineral estate sued the City, alleging that the City had thereby acquired information about the minerals underlying the land, information which the mineral owner claimed to be proprietary. The plaintiff alleged a taking.

The Colorado Supreme Court noted that the digging of the test hole was a physical intrusion into the mineral estate, but concluded that it did not amount to a taking because it did not interfere with the estate owner's use, possession, enjoyment, or disposition of his coal lease since it was a single, transitory physical invasion. *See Grynberg,* 846 P.2d at 182.

*Grynberg* is clearly distinguishable from the case at hand. Here, the case involved an invasion that was neither single nor transitory. Evidence indicated that multiple groundwater monitoring wells were drilled, and the groundwater from the wells was monitored over a period of several years. Moreover, this case is more factually similar to *Hendler* than to *Grynberg,* which is clearly distinguishable from *Hendler.* Indeed, in the *Grynberg* case, the Colorado Supreme Court evidenced its awareness of this court's *Hendler* decision, as well as other similar cases, and stated: "None of these cases is on point. All involve ... extensive excavation of the property, and long-term occupation of the land." *Id.* at 182 n. 9.

■ Furthermore, because we must draw all reasonable inferences in the McKays' favor since they are the non-movant, *see Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, we must infer that the monitoring wells interfered with their mining prospects below the West Spray Field since the wells extended into their mineral estate. Although Colorado law suggests some leeway exists between a mineral estate owner and an owner of the overlying surface estate, we do not read the Colorado cases to require a mineral estate owner to submit to the drilling of multiple wells reaching into the underlying mineral interests for a period of years, similar to the events in *Hendler.* The trial court's application of *Grynberg* conflicts with *Hendler,* as well as the Supreme Court precedent of *Loretto* and *Lucas,* which requires compensation despite the minuteness of the physical invasion. Since evidence was submitted to support a lengthy physical occupation, and it is reasonable to infer that the groundwater monitoring wells interfered with the McKays' mining prospects, summary judgment for the Government of no liability was not warranted.

iii.  Reduction in Mining Permit Area

The physical occupation involving the groundwater monitoring wells is enough to have precluded the trial court from granting summary judgment to the Government, and thus the case must be remanded for further proceedings. In that light, we will also analyze the trial court's reasoning for rejecting the McKays third claim for taking – a regulatory taking based on the reduction of the area of the McKays' special exception mining permit.

■ A regulatory taking occurs when the Government prevents a landowner from making a particular use of the property that otherwise would be permissible. *See Lucas,* 505 U.S. at 1014, 112 S.Ct. 2886. Even if it is not a direct actor, if the Government was involved with or effectively acted through an agent, it is responsible and must bear the consequences of its

actions. *See Loretto; Preseault v. United States,* 100 F.3d 1525, 1551 (Fed.Cir.1996). A regulatory taking may "den[y] all economically beneficial or productive use of land" (a "categorical" taking), *Lucas,* 505 U.S. at 1015, 112 S.Ct. 2886, or have "crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking,'" *Florida Rock Indus. v. United States,* 18 F.3d 1560, 1570 (Fed.Cir.1994). To determine whether a governmental action has gone far enough to effect a taking, courts have engaged in an essentially ad hoc, factual inquiry considering such factors as the economic impact of the regulation on the claimant and the extent to which the regulation has interfered with distinct investment-backed expectations. *See Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

The trial court hinged its regulatory takings analysis on its inference that the McKays, themselves, without influence from the Government, voluntarily reduced the area they were permitted to mine. According to the trial court, the McKays initiated the reduction by "voluntarily" asking to schedule a Board hearing. Thus, they cannot hold the Government responsible for any reduction that resulted. The trial court even went as far as to say that there was no governmental action involved in the process. *See McKay,* No. 94–580L at 10.

■ The trial court erred in not viewing the evidence in the light most favorable to the non-movant, the McKays, and in not drawing all reasonable inferences in their favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. When the record evidence is so viewed, it cannot be said that there is no genuine issue of material fact regarding whether the McKays "voluntarily withdrew" their permit to mine under the West Spray Field without any action or responsibility on the part of the Government. According to the affidavit of Charles McKay, DOE was involved in the re-permitting process. In addition, a copy of the Simonson letter, in which the Government demanded that the McKays' lessee not interfere with its studies, was sent by the Government to the Board. Moreover, the Board relied upon DOE's Closure Plan in making its decision to prohibit mining activities under the West Spray Field until it was established that the area was safe and free of contamination. If any inference must be drawn, it is that the Government influenced the Board to reduce the area covered by the special exception.

The Government and the trial court gave much weight to the fact that the estate of the McKays' grandfather was listed as the applicant for the reduction of the special exception, and that the McKays were straightforward in their dealings with the Board by openly giving the Board a copy of DOE's Closure Plan. Even assuming that the McKays' did submit that application and did give the Closure Plan to the Board, it still can be reasonably inferred from the evidence that the Government's actions motivated them to initiate the re-permitting process, or even left them no choice but to do so. Thus, drawing all reasonable inferences in favor of the non-movants, the least that can be said is that there is a genuine issue of material fact in dispute as to the Government's role in the re-permitting process. Thus, summary judgment for the Government of no liability was inappropriate.

## CONCLUSION

The trial court erred in granting summary judgment because genuine issues of material fact are in dispute. Accordingly, we reverse the grant of summary judgment for the Government and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

## COSTS

No costs.