**GUARDIAN POOL FENCE SYSTEMS, INC., Plaintiff,**

v.

**BABY GUARD, INC., Michael Schatzberg and Wendy Schatzberg, Defendants.**

**No. 00–6394–CIV.**

United States District Court, S.D. Florida.

Oct. 29, 2002.

---

Edward R. Schwartz, Christie, Parker & Hale, Pasadena, CA, for plaintiff.

Robert Edward Pershes, Becker & Poliakoff, Fort Lauderdale, FL, Robert Edward Pershes, Buckingham, Doolittle & Burroughs, Boca Raton, FL, for defendants.

## ORDER

GONZALEZ, District Judge.

**THIS MATTER** has come before the Court on the following cross-motions for summary judgment: (1) Motion for Partial Summary Judgment of Patent Infringement, Patent Validity and Enforceablility, and No Patent Misuse (DE # 109, 110, 111, 112 and 113) of Plaintiff Guardian Pool Fence Systems, Inc. ("Guardian"); and (2) Motion for Summary Judgment or Judgment of Patent Invalidity (DE # 114, 115 and 116) of Baby Guard, Inc. ("Baby Guard")[1]. This matter has been fully briefed and argued by able counsel and is ripe for disposition. The Court has construed the claims of the patent in suit and found that the patent is valid and enforce- able; the Court has also found that Baby Guard's accused device does not infringe the patent in suit. The Court therefore **ORDERS** and **ADJUDGES** as follows: Guardian's Motion for Summary Judgment of Patent Validity and No Misuse is **GRANTED**; Guardian's Motion for Summary Judgment of Patent Infringement is **DENIED**; Baby Guard's Motion for Summary Judgment regarding non-infringement is **GRANTED**; Baby Guard's Motion for Summary Judgment of Invalidity is **DENIED**.

## I. BACKGROUND.

Guardian is the assignee of U.S. Patent No. 5,664,769 (issued Sept. 9, 1997) (the "'769 Patent") entitled "Swimming Pool and Spa Tensioned Protective Fence with Auto Lockable Gate and Method of Installation Thereof." The invention claimed in the '769 Patent is in essence a removable, tensioned, gated fence employed to prevent unsupervised children from entering a swimming-pool area. *See* '769 Patent, col. 1, 2. Fences used for this purpose typically utilize a series of vertical, upright poles inserted into the pool deck with a tightly woven mesh screen pulled taught, or "tensioned", by the upright poles to form the fence structure. If adults desire unfettered access to the pool area, the fence poles can be removed from their pool-deck sockets and the entire structure can be spooled into an easily stored bundle. The use of the tightly woven mesh screen makes climbing the fence more difficult for children than if the fence were one of chainlink or a similar material because the mesh weave is too tight to provide children with handholds or footholds. In addition, the absence of a top horizontal bar framing the tensioned mesh further

---

[1] Hereinafter, Guardian's Motion will be cited as "Plaintiff's Mot."; Baby Guard's Motion will be cited as "Defendant's Mot.".

frustrates a child's attempt to scale it because the uppermost portion of the mesh screen itself is insufficiently rigid to provide a child with a handhold. Thus, upon grabbing the bound upper edge of the screen, a would-be young climber is rendered exasperated (pouting, in all likelihood) and, for the time being at least, kept outside of the swimming-pool area.

The patentees/assignors of the '769 Patent sought to remedy at least two perceived shortcomings in the prior art relating to the gates associated with fences of this type. *See id.* First, older tensioned fences would typically utilize a "gate" consisting of a hook-and-eye fastener between two of the vertical, upright fence poles. The horizontal tension of the mesh screen pulling the two upright poles away from one another would keep the hook-and-eye fastener engaged. To open such a "gate", one would push together the two poles, to which the respective parts of the hook-and-eye fastener were attached, thereby removing the horizontal tension on the fastener, then lift one of the upright poles from its pool-deck socket, and slide one of the fence sections ajar. To close such a "gate," one would reinsert the upright pole into the pool deck and re-engage the hook-and-eye fastener. The patentees stated that gates of this type are difficult for persons short in stature or physical strength to operate due to the tension on the overall structure, in general, and on the hook-and-eye fastener, in particular. *See* '769 Patent, col.1, lines 46–50.

The patentees also endeavored to improve upon prior-art tension-free, hinged, swinging fence gates. Such prior art gates were unsuitable for keeping unsupervised children away from a swimming-pool area because, while such gates might address the problems associated with a gate having a tensioned hook-and-eye fastener, such gates typically had a top horizontal bar to provide the gate sufficient structural integrity. A top horizontal bar on the gate constitutes a weak point in a fence whose purpose is to keep unsupervised children away from a swimming pool area, a weak point that a particularly mischievous child could exploit by using the bar as a handhold.

The patentees addressed the perceived shortcomings in the prior art, generally speaking, in the following manner. First, to produce a tensioned fence with a gate that would be tension-free and more easily opened and closed by adults, the patentees created a frame for the gate employing pairs of bracketed vertical poles, or "trusses". One truss is inserted into the pool deck on each side of the intended position of the gate; both trusses are angled toward the intended position of the gate at approximately five degrees from the vertical position. *See* '769 Patent, col. 3, lines 18–56 and fig. 3. The hinges of the gate are affixed to the innermost pole of one of the trusses, and the latch is affixed to the innermost pole of the opposite truss. *See id.* Angling the trusses toward the gate absorbs some of the horizontal tension that the remainder of the fence exerts upon the trusses in the opposite direction, away from the gate; the tension pulls the trusses ever-so-slightly away from the gate opening and toward a true vertical position. *See id.* Second, the patentees produced a gate structure without a top horizontal bar but with sufficient integrity to perform its proper function. *See* '769 Patent, col. 3, line 57 to col. 4, line 12. The gate is both shown in figure 3 of the '769 Patent and described in the written description of the invention as "U-shaped" in its preferred form. *See id.* and fig. 3.

This invention is set forth in the nineteen claims of the '769 Patent, which include three independent claims: 1, 11, and 15. Guardian has asserted only claims 1 and 15 against Baby Guard. *See* Plaintiff's

Mot. at 2. Claim 1 regards the patented device itself and reads as follows:

1. A lightweight fence and gate for swimming pools surrounded by a deck comprising a plurality of poles adapted to be inserted into the pool decking adjacent said pool;

a mesh screen tensioned between said poles having top and bottom bindings; *a gate in said fence including a frame having a pair of spaced upright support members, a first horizontal brace for spacing the upright support members and length of mesh screen tensioned between said upright support members; support means capable of withstanding lateral tension forces of said screen for supporting and latching said gate;*

hinges secured to said support means on one side of said gate; and

a latch device secured to said gate and to said support means on the opposite side of said gate.

'769 Patent, col. 5, lines 7–25 (emphasis added). Claim 15 regards the method for installing the patented device and reads as follows:

15. The method for installing a self closing gate in a tensioned removable swimming pool fence comprising a plurality of poles interconnected by flexible mesh fencing comprising:

inserting a series of said plurality of poles into a deck surrounding a swimming pool with the flexible mesh fencing in tension to maintain the fence in tension;

the first and last poles of said series of poles defining a gate opening;

said first and last poles each constituting a pair of poles interconnected to each other to define a support structure capable of absorbing the tension of the flexible mesh fencing;

fabricating a gate including a pair of side rails, a cross rail and flexible mesh tensioned between said side rails;

hinging the first of said pair of side rails of said gate to the first of said pair of poles; and

installing a latch between the second of said pair of side rails of said gate and said last pole of the tensioned fence; whereby the gate is free to open and close without interference by the tension of the mesh of said fencing.

'769 Patent, col. 6, lines 23–45.

Baby Guard markets a removable, tensioned, gated fence for use on a swimming-pool deck. Baby Guard's fence is generally comprised of a series of vertical, upright poles inserted into the pool deck with a tightly woven mesh screen tensioned on the upright poles. The gate in Baby Guard's fence is framed, however, by two sections of fence—one section on either side of the intended location of the gate—which are comprised of two vertical, upright poles and two horizontal bars with the mesh screen tensioned over them. *See* Defendant's Mot. Ex. 2. These two sections of fence have, unlike the remainder of Baby Guard's fence, a top horizontal bar and a second horizontal bar—positioned roughly midway between the top horizontal bar and the pool deck—connecting the upright poles. *See id.* The silhouettes of these two sections of fence therefore appear as rectangular arches—with an additional horizontal crossbar—whose vertical members are inserted into the pool deck. *See id.* The hinges and latch of the gate of Baby Guard's fence are affixed to the respective innermost upright poles of these two arch-like fence sections, which frame the fence opening for the gate. *See id.* Baby Guard's gate is rectangular, consisting of two vertical bars and two horizontal bars—one forming the bottom of the gate and one forming the top—with the mesh screen tensioned on this rectangular structure. *See id.* Baby Guard's fence therefore includes a rectangular gate framed by

two generally rectangular, arch-like sections of fence, all three of which have top horizontal bars; the remainder of the fence consists of upright poles and tensioned mesh.

Guardian brought this action for patent infringement against Baby Guard in the United States District Court for the Central District of California on December 13, 1999. The case was subsequently transferred to this Court on March 20, 2000. After the parties failed to reach a settlement in mediation, this Court held a hearing regarding the proper construction of the claims of the '769 Patent, pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), on November 6, 2001. Upon the Court's order, the parties then submitted their respective motions for summary judgment and accompanying materials.

Guardian argues that Baby Guard's fence infringes claims 1 and 15 of the '769 patent, properly construed, either literally or under the doctrine of equivalents. Baby Guard counters (1) that its fence does not infringe the claims of the '769 Patent, properly construed, or alternatively (2) if the "properly construed" claims of the '769 Patent do in fact encompass Baby Guard's fence, then the '769 Patent must be invalid as anticipated by the prior art. The parties disagree, in essence, about the proper construction of the two elements in claim 1 quoted with emphasis *supra* at 1350–1351: (1) the "gate" element, which states "a gate in said fence including a frame having a pair of spaced upright support members, a first horizontal brace for spacing the upright support members and length of mesh screen tensioned between said upright support members"; and (2) the "support means" element, which states "[a] support means capable of withstanding lateral tension forces of said screen for supporting and latching said gate" *See* '769 Patent, col. 5, lines 12–20.

Regarding the gate element, Guardian argues that any gate that includes two upright members and "a horizontal brace" would "read on" (in patent nomenclature) this element, properly construed, even if such a gate has additional horizontal bars, and even if such a gate has a top horizontal bar, as does Baby Guard's rectangular gate. Guardian argues that the terms of claim 1 ought to be given their ordinary meanings, and that nothing about the language of the gate element precludes a gate with a top horizontal bar from reading on it. Baby Guard argues that this element of claim 1, properly construed, ought to be understood as limiting the claimed invention to a fence with a U-shaped gate, in keeping with the patentees' expressed aim to avoid providing unsupervised children with handholds that could be used to scale the fence.

Regarding the support-means element, Guardian and Baby Guard agree that this element is written in so-called "means-plus-function" format, which is a particular format for drafting an element of a patent claim set forth in 35 U.S.C. § 112, ¶ 6. Section 112, ¶ 6 also sets forth rules for the construction of elements drafted in means-plus-function format. Guardian argues that, if the support-means element were properly construed as means-plus-function elements are to be construed, the generally rectangular, arch-like fence sections that frame the gate in Baby Guard's fence would read on this element of the '769 Patent. Baby Guard argues that the support means for the gate in its fence could not read on the support-means element of the '769 Patent, properly construed.

## II. Law and Analysis.

### A. Summary Judgment in Patent Infringement Cases.

Summary judgment shall be entered if "the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.,* 239 F.3d 1225, 1231 (Fed.Cir.2001) (quoting *McKay v. United States,* 199 F.3d 1376, 1380 (Fed.Cir.1999)).

■ Summary judgment may be appropriate in a patent infringement case, as in any other case. A determination of patent infringement entails a two-step analysis. *See id.* at 1231 (citation omitted). First, the claims must be properly construed to determine their scope and meaning. *See id.* (citation omitted). "Second, the analysis requires a comparison of the properly construed claims to the accused device [or method], to see whether that device [or method] contains all of the limitations, either literally or by equivalents, in the claimed invention." *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1365 (Fed.Cir.2002) (citations omitted). Patent claim construction is an issue of law. *See Wenger* at 1231 (citing *Markman*). Whether an accused device or method infringes a patent, either literally or under the doctrine of equivalents, however, is a question of fact. *See id.* But, when the parties do not dispute the structure of the accused device, as here, the infringement analysis turns on the interpretation of the claims. *See CCS Fitness* at 1365 (citations omitted).

## B. General Principles of Claim Construction.

■ Claim construction begins with an examination of the "intrinsic evidence": the claims themselves; the patent specifi-

cation, which includes the remainder of the written and graphic description of the invention in the patent; and the patent prosecution history, which includes the patent application and correspondence between a patentee and the Patent and Trademark Office ("PTO") examiners reviewing the application. *See CCS Fitness* at 1366 (citations omitted). Courts may also consider extrinsic evidence, such as expert testimony and treatises, to resolve the scope and meaning of a claim term. *See id.* (citations omitted).

■ Courts are to indulge a heavy presumption that terms used in a claim carry their ordinary and customary meanings. *See id.* (citations omitted). An accused infringer may, however, overcome this presumption and narrow the ordinary meaning of a claim term, but he or she cannot do so "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *See id.* (citations omitted). A court may constrict or limit the ordinary meaning of a claim term in at least one of four ways. *See id.* "First, the claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *Id.* (citations omitted). "Second, a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *Id.* at 1366–67 (citing, *inter alia, Spectrum Int'l, Inc. v. Sterilite Corp.,* 164 F.3d 1372, 1378 (Fed.Cir.1998)). "Third ... a claim term also will not have its ordinary meaning if the term 'chosen by the patentee so deprives the claim of clarity' as to require

resort to the other intrinsic evidence for a definite meaning." *Id.* (citation omitted). And fourth, when the patentee has phrased a claim or an element of a claim in means-plus-function format, "as a matter of statutory authority, a claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto." *Id.* (citing 35 U.S.C. § 112, ¶ 6; *Watts v. XL Sys., Inc.,* 232 F.3d 877, 880–81 (Fed. Cir.2000)). The second and fourth scenarios are most pertinent to the instant case.

## C. Claim Construction and Infringement Analysis of the Gate Element.

■ Again, the gate element reads as follows: "a gate in said fence including a frame having a pair of spaced upright support members, a first horizontal brace for spacing the upright support members and length of mesh screen tensioned between said upright support members." *See supra* at 1352. The Court finds that the term "gate" as used in the '769 Patent must be construed to be limited to a gate with additional horizontal members, if any, well below the top of the mesh screen tensioned on the upright members of the gate structure. As noted *supra* at 1354, "a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness* at 1366–67 (citing, *inter alia, Spectrum Int'l, Inc. v. Sterilite Corp.,* 164 F.3d 1372, 1378 (Fed.Cir.1998)). The Court finds that the specification and prosecution history of the '769 Patent require that the meaning of the term "gate" as used in the patent be limited in the fashion stated.

First, regarding the relationship between the claims and the specification, the Federal Circuit has made clear that, "the claims are always construed in light of the specification, of which they are a part." *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1352 (Fed.Cir.2001) (citation omitted). "The role of the specification includes presenting a written description of the ... subject matter of the invention, while the role of the claims is to point out with particularity the subject matter that is patented." *Id.* (citing 35 U.S.C. § 112, ¶¶ 1,2). "The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose." *Id.* Therefore, "[a]lthough the specification need not present every embodiment or permutation of the invention, and the claims are not limited to the preferred embodiment of the invention, neither do the claims enlarge what is patented beyond what the inventor has described as the invention." *Id.* (internal citation omitted).

The specification of the '769 Patent makes clear that the patented gate must be one whose additional horizontal braces, if any, are well below the top of the mesh screen tensioned on the upright members of the gate structure. The patentees state in their brief description of the invention that, "faced with [the] state of the art, we determined that it should be possible to produce *a tension protective fence with a gate presenting the same overall appearance and degree of safety* with far superior accessibility for adults but presenting extreme difficulty for a child to defeat the gate and fence." '769 Patent, col. 1, lines 56–60 (emphasis added). After describing the support means for the gate, the patentees then state, "this is all accomplished in cooperation *with a gate in the preferred form of frame of a 'U' shape with a bottom bar, side rails and angle bracing rods or gusset plates for reinforcement and a fabric fence material matching the fence extending between the legs of the gate.*" '769

Patent, col. 2, lines 7–13. Referring to figure 3 in the detailed description of the invention, the patentees continue, stating that, "the gates G1 and G2 [ ] are made up, preferably of three frame members including a hinged upright 31, base member 32 and a latched upright 33. . . . The cross brace CB shown in dashed lines might be used for bending strength *provided it is on the pool side of the gate and well below the top of the gate fabric.*" '769 Patent, col. 3, line 58 to col. 4, line 2 (emphasis added). The patentees continue:

> *To provide uniformity of appearance and freedom from any rigid top cross bar structure on the gate, the U shaped gate is employed as shown in FIG. 3.* It is important that the gate have sufficient strength and rigidity to operate properly for years. *It also resists any failure if a child attempts to climb it.* We have designed such a gate which will not fail if weights equivalent to a 70 pound youngster are applied to the gate.

'769 Patent, col. 4, lines 5–12 (emphasis added). And, concluding the written description, the patentees identify the following three (out of a total of six) features of their invention: (1) "Provides a gate *which has a degree of protection of a child climbing it comparable to the fence itself*"; (2) "Provides a design of a gate *which provides few if any hand holds or foot grips for any child attempting to climb the fence*"; and (3) "Provides a pool security gate *with no top gate bar.*" '769 Patent, col 4., lines 55–67 (emphasis added).

The language in the specification identified above does not require a construction of the gate element as restrictive as that proposed by Baby Guard—*i.e.,* that the claimed gate must be limited to the preferred embodiment of a U-shaped gate. But, in light of the patentees' written and graphic description of the invention, the gate element cannot be construed to cover gates with a top horizontal bar.

In addition, the prosecution history of the '769 Patent further supports this construction of the gate element. On February 10, 1997, the PTO examiner rejected, on various bases, all twenty-one claims originally included in the patentees' application of November 13, 1996. *See* Defendant's Mot., Ex. 9. The examiner rejected claims 1 and 17 (the predecessor to claim 15 in suit), among others, on the basis that they were anticipated by the prior art under 35 U.S.C. § 102(b). *See id.* at 2–3. The examiner stated that the gate shown in the figures of an identified prior art fence "*is supported by a U-shaped frame* and attached to the fence by support means." *See id.* (emphasis added). The necessary implication of the examiner's statement here is that he understood both the prior art gate and the gate claimed in the patentees' application to be limited to a U-shaped gate.

On April 2, 1997, the patentees filed an amendment to their application in response to the examiner's February 10 rejection. Addressing the examiner's rejection of claims 1 and 17, among others, as anticipated by the prior art, the patentees stated, *inter alia,* that the prior art gate referenced by the examiner in the February 10 rejection "is not a gate *and not U-shaped, but rectangular.*" *See* Defendant's Mot., Ex. 10 at 4 (emphasis added). The necessary implication of the patentees' statement is that, while the prior art gate was not U-shaped in their view, the gate they were claiming in their application was, and hence the examiner wrongly determined that their invention was unpatentable as anticipated by the prior art the examiner had referenced.

On April 16, 1997, after the patentees filed the April 2 amendment, the patentees attended an interview with the examiner. *See* Defendant's Mot., Ex. 5. The examiner's interview summary record states that

the claims discussed were claims 1, 4, 6, 17 (the predecessor to claim 15), 18 and 21. *See id.* The record further states that, "[t]he examiner stated that the poles being inserted into the ground at an angle to the vertical *and the use of U-shaped support for the gate with the U opening upwardly would not be shown by the art of record.*" *See id.* (emphasis added). In response to this interview, the patentees submitted a second amendment to their application on April 18, 1997. *See* Defendant's Mot., Ex. 11.

In the April 18 amendment, the patentees stated that the examiner's interview summary record "appears as correct and the applicant's agree with the examiner's conclusion." *See id.* at 5. In response to the interview, the patentees also made two additional amendments to the claims that are relevant to the instant analysis. First, the patentees amended the gate element of claim 1 by inserting the word "first" before the phrase "horizontal brace". *See id.* at 1. This amendment plainly recognizes that the claimed invention gate is not limited to gates with only three members: two upright members and one horizontal brace. The necessary inference is that second or even more additional horizontal braces are contemplated by claim 1, and claim 1 is therefore not properly construed as limited only to the preferred, three-member, U-shaped embodiment, as Baby Guard argues.

Second, the patentees amended dependent claim 6, which depends from dependent claim 4, which in turn depends from claim 1. In the April 18 amendment, the patentees added the phrase "opening upwardly", emphasized in the quotation below, to the then existing language of claim 6, so that claim 6 as allowed by the examiner reads as follows:

A lightweight fence and gate as claimed in Claim 4 wherein said gate includes a generally U-shaped frame *opening up-wardly* with said first horizontal brace secured to the lower ends of said upright support members and a second horizontal brace secured to said upright support members on the pool side of said mesh at a height well below the top of said gate.

*See id.* (emphasis original). This exchange between the examiner and the patentees, particularly in light of the specification, makes clear that the examiner suggested, and the patentees added, this amendment to claim 6 acknowledging that claim 1, from which claim 6 ultimately depends, would not countenance a U-shaped frame "opening downwardly", because such a gate would in fact be arch-like, *i.e.*, it would have a top horizontal bar.

In light of the specification and the prosecution history of the '769 Patent, the gate element of claim 1 cannot be construed to cover gates with top horizontal members. The term "gate" in the gate element must be construed to be limited to gates whose additional horizontal members, if any, are positioned well below the upper edge of the mesh screen tensioned on the gate frame. Therefore, the gate element, properly construed, covers not only U-shaped gates, but also gates with additional horizontal members, so long as such members are well below the upper edge of the tensioned screen. The invention gate, however, does not and cannot cover rectangular gates, gates in the shape of an inverted U, or any other gate with a top horizontal bar.

■ With the gate element properly construed, it is clear that the gate in Baby Guard's fence does not literally infringe claim 1—or claim 15, or any other claim— of the '769 Patent. Under the so-called "all elements rule", to establish literal infringement, all of the elements of the claim, once properly construed, must be present in the accused device. *See Net-*

*word*, 242 F.3d at 1353 (citation omitted). The gate element of claim 1 of the '769 Patent does not cover gates with top horizontal members. Baby Guard's fence gate is rectangular, having a top horizontal member. The gate element of claim 1 of the '769 patent is therefore not present in Baby Guard's fence gate, and, as a matter of law, Baby Guard's fence gate does not literally infringe the '769 Patent.

The Court further finds that the gate in Baby Guard's fence does not infringe claim 1 of the '769 Patent under the doctrine of equivalents. The essential inquiry under the doctrine of equivalents is: "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The United States Supreme Court has stated that the so called "triple identity" or "function-way-result" test is suitable for evaluating accused mechanical devices for infringement under the doctrine of equivalents. *See id.* at 39–40, 117 S.Ct. 1040. Under this test, the Court must determine whether "the element of the accused device at issue performs substantially the same function, in substantially the same way, to achieve substantially the same result" as the corresponding element in the patented device. *See Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1016 (Fed.Cir.1998) (citation omitted). Baby Guard's gate does not perform substantially the same function as Guardian's gate. The function of Guardian's gate is two-fold: provide easy access to the pool area for adults and as little access to the pool area for unsupervised children as the remainder of the fence. Baby Guard's gate performs only one of these because Baby Guard's gate does not deprive children of a handhold at the top of the gate. The "way" the two gates seek to perform the two-fold function is substantially different: Guardian's does so by depriving the children of as many handholds as possible; Baby Guard's by presenting children with a potentially climbable obstacle. The result likewise cannot be substantially the same, as Guardian's gate clearly affords more swimming-pool deck security than does Baby Guard's because, as the saying goes, "a chain is only as strong as its weakest link". Baby Guard's gate therefore is not an equivalent of the gate element of the '769 Patent; under the all elements rule, Baby Guard's device therefore does not infringe the '769 Patent under the doctrine of equivalents.

Because Baby Guard's device does not infringe all of the elements of any of the claims asserted by Guardian in this action, Baby Guard would be entitled to summary judgment of non-infringement without further inquiry. For the sake of thoroughness and to afford Guardian the clearest possible understanding of the bounds of its property right as embodied in the '769 Patent, the Court will nevertheless perform the claim construction and infringement analysis of the support-means element.

## D. Claim Construction and Infringement Analysis of the Support–Means Element.

As noted *supra* at 1352, the support means element reads as follows: "[a] support means capable of withstanding lateral tension forces of said screen for supporting and latching said gate." '769 Patent, col. 5, lines 18–20. "In determining whether a claim limitation is a means-plus-function-limitation, the use of the word 'means' creates a presumption that § 112, ¶ 6 applies." *Wenger* at 1232 (citation and internal quotations omitted). As noted, the parties do not dispute that the support-means element is written in means-plus-function format. Therefore, given both the presumption and the absence of

any evidence in the record to the contrary, the Court finds that the support-means element is written in means-plus-function format.

 Section 112, ¶ 6 provides that means-plus-function elements, "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Literal infringement of a means-plus-function element "requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." *Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1267 (Fed.Cir.1999) (citations omitted). "Functional identity and either structural identity or equivalence are *both* necessary." *See id.* (emphasis original) (citation omitted). The respective inquiries for (1) equivalency under the doctrine of equivalents and (2) statutory equivalence of a means-plus-function element under § 112, ¶ 6 are "rooted in similar concepts of insubstantial difference" but the inquiry for statutory equivalence under § 112, ¶ 6 "is narrower." *Odetics*, 185 F.3d at 1267 (citations omitted). "This is because, under § 112, ¶ 6 equivalence, functional *identity* is required; thus the equivalence (indeed, identity) of the 'function' of the assertedly substitute structure ... must be first established in order to reach the statutory equivalence analysis." *Id.* (citation omitted) (emphasis original). "That is, the statutory equivalence analysis requires a determination of whether the 'way' the assertedly substitute structure performs the claimed function, and the 'result' of that performance, is substantially different from the 'way' the claimed function is performed by the 'corresponding structure, acts or materials described in the specification,' or its 'result.'" *Id.* "Structural equivalence under § 112, ¶ 6 is met only if the differences are insubstantial; that is, if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure in the specification." *Id.* (citing 35 U.S.C. § 112, ¶ 6) (internal citation omitted).

The function of the support means, recited in the element itself, is that the corresponding structure is to be "capable of withstanding lateral tension forces of said screen for supporting and latching said gate." '769 Patent, col. 5, lines 18–20. The corresponding structure identified in the specification to perform this function is described in the brief description of the invention in the following manner:

> a multiple pole truss arrangement at each side of the intended gate opening with multiple poles forming a rigid truss yet having hardly any additional size than the single pole and arranging the poles to be canted [*i.e.*, angled] sufficiently to provide free standing end posts defining the gate opening. *Multiple poles adjacent to the gate relieve the gate from the tension present in the fence.*

'769 Patent, col. 1, line 64 to col. 2, line (emphasis added). Referring to figure 3 in the specification, the patentees describe the support means structure in the detailed description in the following manner:

> The gates G1 and G2 may be seen better in FIG. 3 with the pair of poles 20, 22 on one side and 21, 23 on the other side, each pair interconnected by respective cross members 24 and 26 on the hinged side and 25, 27 on the latched side. *The net result is that each of the 20 and 22 poles with their cross members 21, 23 form a vertical truss with each pole 20 & 22 in its respective socket S, in the deck PD. The deck sockets S are drilled at a cant angle of approximately five degrees toward the gate so that fence 10 is tensioned while the gate opening GO*

*is without any tension from the fence 10 transferred to the gate G. The poles on the hinged side each bend imperceptively to the vertical by the fence tension from the left. The same is true for the poles 21 and 23 responding to fence tension from the right.*

'769 Patent, col. 3, lines 31–44.

■ Guardian claims that the two arch-like fence sections in Baby Guard's fence that frame the opening for Baby Guard's gate are identical or equivalent, under § 112, ¶ 6, to the structure identified in the specification of the '769 Patent for ensuring a tension-free gate. The Court finds that the support means for the gate in Baby–Guard's fence does not read on the support-means element in the '769 Patent. The Court finds that the *function* of the respective support-means structures in the '769 Patent and the accused device are identical. The two arch-like fence sections in Baby Guard's fence are clearly designed to "withstand[ ] lateral tension forces of said screen for supporting and latching said gate." '769 Patent, col. 5, lines 18–20.

The Court nevertheless finds that substantial differences exist between the *way* Baby Guard's support means performs this function and the *way* the support means identified in the '769 Patent perform it; the Court also finds substantial differences between the *result* achieved by Baby Guard's support means and the *result* achieved by Guardian's support means. The support means identified in the specification, as shown in figure 3 and described in the written description, consists of two "trusses". Each truss consists of a pair of poles bracketed together, and each truss is inserted into the pool deck at an angle toward the gate to absorb the lateral tension of the fence, a feature of the invention that the PTO examiner found to be novel. *See supra* at 1354. The *way* in which Baby Guard's support means absorbs the lateral tension of the fence—using two arch-like whole fence sections inserted in the pool deck without any canting—is neither identical, nor substantially similar, to the *way* in which Guardian's support means does. In addition, the *result* achieved by Baby Guard's support means is substantially different from the *result* achieved by Guardian's. Baby Guard's support means provides a child with a potential handhold for climbing the fence that is at least several feet long. Guardian's provides no such handhold. The Court therefore finds that the support means of Baby Guard's fence does not read on the support-means element of the '769 Patent.

## E. Patent Validity and Patent Misuse.

■ Guardian has also moved for summary judgment of patent validity and no patent misuse—which a co-defendant of Baby Guard, Wendy Schatzberg, has asserted as an affirmative defense. The Court finds that the '769 Patent, as construed by the Court, is valid. Patents are statutorily presumed to be valid under 35 U.S.C. § 282. There is no evidence in the record to suggest that the '769 Patent as construed by the Court is invalid. The Court also finds that Guardian is entitled to summary judgment of no patent misuse. Patent misuse "is an extension of the equitable doctrine of unclean hands, whereby a court of equity will not lend its support to enforcement of a patent that has been misused." *B. Braun Medical, Inc. v. Abbott Labs.*, 124 F.3d 1419, 1427 (Fed.Cir. 1997) (citation omitted). "Patent misuse arose, as an equitable defense available to the accused infringer, from the desire 'to restrain practices that did not in themselves violate any law, but that drew anticompetitive strength from the patent right, and thus were deemed to be contrary to public policy.' " *Id.* (citation omitted). There is no evidence in the record—and neither Baby Guard, nor its co-defendants direct the Court to any evidence—that any

conduct on Guardian's part would give rise to an equitable defense of patent misuse. The Court therefore finds that Guardian is entitled to summary judgment of no patent misuse.

## III. Conclusion.

The Court has construed the claims of the '769 Patent and compared Baby Guard's accused device thereto. The '769 Patent is valid and enforceable; Baby Guard has not infringed the patent; Guardian has not misused the '769 Patent. The Court therefore **ORDERS** and **AD-JUDGES** as follows:

1. Guardian's Motion for Summary Judgment of Patent Validity and No Misuse is **GRANTED**;

2. Guardian's Motion for Summary Judgment of Patent Infringement is **DENIED**;

3. Baby Guard's Motion for Summary Judgment regarding non-infringement is **GRANTED**;

4. Baby Guard's Motion for Summary Judgment of Invalidity is **DENIED**.