### In re John W. HOWARD, Debtor.

### Carlota M. Bohm, (Trustee for the Bankruptcy Estate of John W. Howard), Plaintiff,

v.

### Victoria M. Howard, Defendant.

### Bankruptcy No. 08–22224JAD. Adversary No. 09–02127JAD.

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 10, 2009.

---

Carlota M. Bohm, Mary–Jo Rebelo, Houston Harbaugh, P.C., Pittsburgh, PA, for Plaintiff.

Avrum Levicoff, Levicoff Silko & Deemer PC, Pittsburgh, PA, for Defendant.

### *MEMORANDUM OPINION*

JEFFERY A. DELLER, Bankruptcy Judge.

This Adversary Proceeding concerns the competing rights of the Plaintiff, the Chapter 7 Trustee for the bankruptcy estate of John W. Howard, and the Defendant, Victoria M. Howard, with respect to certain mineral rights, including oil, gas and coal, underlying that certain tract of land situate in Whitley Township, Greene County, Pennsylvania and described more fully in that certain Quit Claim Deed annexed to this Memorandum Opinion at Appendix 1 (collectively, the "Mineral Rights").

By this Adversary Proceeding, the Trustee contends that due to her "strong arm" powers found at 11 U.S.C. § 544, the Trustee's interest in the Mineral Rights is superior to any interest claimed by Victoria M. Howard in such property. As such, the Trustee is requesting that the Mineral Rights, and any proceeds relating to the same, be turned over to the Trustee pursuant to 11 U.S.C. §§ 542(a) and 550(a).

Because the Defendant Victoria Howard caused the Mineral Rights to be quit claimed to herself after the filing of this bankruptcy case, the Trustee further requests that the Court declare the conveyance evidenced by the quit claim deed void pursuant to 11 U.S.C. §§ 362(a) and 549. In support of this request, the Trustee

contends that the transfer violated the automatic stay and constitutes an unauthorized post-petition transfer because no prior bankruptcy court approval was sought or obtained in connection with the execution and recording of the quit claim deed. The Trustee also seeks compensatory and punitive damages pursuant to 11 U.S.C. § 362(k) as a result of the Defendant's willful violation of the automatic stay.

After the Adversary Proceeding was filed, and the pleadings closed, the Defendant filed a *Motion for Summary Judgment* requesting that the Adversary Proceeding be dismissed. The Chapter 7 Trustee objected to the Defendant's motion, and the Chapter 7 Trustee filed her own *Cross–Motion for Summary Judgment.*

After due consideration of the dueling motions and related submissions filed by the parties, along with the record made in these proceedings, it appears that there is no genuine issue of material fact and that the Trustee is entitled to a judgment as a matter of law with respect to (a) the Trustee's superior interest in the subject Mineral Rights and the proceeds associated with the same; (b) the Trustee's right to compel turnover of the subject Mineral Rights and its proceeds; (c) the voidability of the Defendant's claimed interest in the Mineral Rights and the voidability of the Defendant's attempt to improperly convey the Mineral Rights to or for the benefit of herself; (d) the liability of the Defendant with respect to her dissipation of proceeds of property of the estate; and (e) the liability of the Defendant's willful violation of the automatic stay.

The Court, however, also finds that the record of these proceedings is not currently developed enough to make any findings with respect to whether Ms. Howard should be required to pay the Chapter 7 Trustee any additional compensatory or punitive damages (above and beyond the turnover of the Mineral Rights and its proceeds) under the facts of this case. Given these circumstances, and for the reasons set forth herein, the Court will enter an order which (a) denies the Defendant's *Motion for Summary Judgment,* and (b) grants, in part, the Chapter 7 Trustee's *Cross–Motion for Summary Judgment.*

## I.

On April 4, 2008, John W. Howard, ("Debtor"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. (*See* Dkt. #1, Case No. 08–22224JAD). When he commenced this bankruptcy case, the Debtor was the sole shareholder of two closely held corporations, John Howard Chrysler Jeep Dodge, Inc. and John Howard Pontiac Buick–GMC, Inc. (collectively, the "Dealerships"). The Dealerships are also debtors in bankruptcy before this Court—with John Howard Chrysler Jeep Dodge, Inc. having filed for bankruptcy relief on February 7, 2008 at Case No. 08–20777–JAD and John Howard Pontiac Buick–GMC, Inc. having filed for bankruptcy relief on April 4, 2008 at Case No. 08–22223–JAD.

Shortly after the filing of John W. Howard's individual bankruptcy case, and upon motion of the Debtor's major creditor (United Bank), this Court ordered the appointment of a Chapter 11 Trustee on April 29, 2008. (*See* Dkt. #26, Case No. 08–22224–JAD).

The Court had ordered the appointment of a Chapter 11 Trustee because the Debtor had demonstrated a consistent pattern of either dishonesty and/or incompetence with respect to the management of his and his corporations' affairs, both before the filing of the instant case and thereafter.

Examples of the Debtor's dishonesty or incompetence included: the Debtor's failure to file an accurate list of all of his creditors when he commenced this bankruptcy case; the Debtor causing his business entities to sell vehicles "out of trust" to the detriment of United Bank; the Debtor's improper removal and transfer of records in the Dealership cases; and the transfer (or attempted transfer) of certain assets of this estate and/or the Dealership estates to friends and family of the Debtor. (*See* Audio Recording of Hearing, Courtroom D, 04/29/2009 from 1:28:00 PM–1:35:02, Case No. 08–22224–JAD).[1]

The Debtor's personal chapter 11 filing was converted to a liquidation under chapter 7 on July 14, 2008, and Carlota M. Bohm, who previously served as Chapter 11 Trustee for the bankruptcy estate of John W. Howard, was appointed as the Chapter 7 Trustee. (*See* Dkt. # s 162 and 191, Case No. 08–22224JAD). Ms. Bohm is the plaintiff in this action.

Defendant, Victoria M. Howard, is the Debtor's ex-spouse. The Debtor and Defendant were married on December 25, 1987 and divorced September 28, 1998. (*See* Dkt. # 27, pp. 3–4).[2] The Defendant is also a creditor of the Debtor, having filed a proof of claim with this Court on May 27, 2008. (Claim # 5, Claims Register, Case No. 08–22224–JAD). The claim

is signed by Ms. Howard, and avers that it is in the amount of "$6,000 per month" and the basis of the claim is alleged to be "permanent alimony."

It is undisputed that prior to their marriage, the Mineral Rights were owned by the Debtor. (*See* Dkt. # 31, Appendix 1 to the *Trustee's Memorandum of Law in Response to Defendant's Motion for Summary Judgment or Partial Summary Judgment and in Support of Trustee's Cross Motion for Summary Judgment*). In fact, no party has suggested otherwise in their submissions. Copies of the deeds submitted by the parties in connection with these proceedings reflect that John Howard and his prior wife, Peggy J. Howard, acquired the Mineral Rights in 1984 as tenants-by-entireties. (*See* Dkt. # 31, Exhibit C). When that marriage ended in divorce, the Mineral Rights were essentially re-deeded by John W. Howard and Peggy J. Howard to John W. Howard only. (*See* Dkt. # 31, Exhibit E).[3]

The issues that permeate this case center solely on whether such Mineral Rights were in-fact ever conveyed to the Defendant Victoria M. Howard at any time prior to the commencement of the instant bankruptcy case, and whether Ms. Howard ever had adequately recorded her putative interest. No instrument in favor of the

---

**1.** The United States Bankruptcy Court for the Western District of Pennsylvania keeps an audio record of all court proceedings. A copy of the audio file, and a transcript of the same, may be obtained by any litigant upon the submission of a written request and remittance of the requisite fee to the Clerk of the United States Bankruptcy Court. Guidance as to how a litigant may obtain a transcript, or copy of a recording, is also readily available in the "Frequently Asked Questions" section of the Court's website found at www.pawb.uscourts.gov.

**2.** Unless otherwise noted in the citation, all references in this Memorandum Opinion to

"Dkt. # ___" refers to the document(s) filed of record in this Adversary Proceeding at Adv. No. 09–02127–JAD.

**3.** The actual chain of title is more complicated. (*See* Dkt. # 31, Appendix 1 to the *Trustee's Memorandum of Law in Response to Defendant's Motion for Summary Judgment or Partial Summary Judgment and in Support of Trustee's Cross Motion for Summary Judgment*). But, the transfers germane to the resolution of the dueling summary judgment motions are the ones set forth in the body of this Memorandum Opinion.

Defendant (reflecting that such alleged in·terest was duly recorded prior to the commencement of the Debtor's bankruptcy case) has been produced or filed with the Court in connection with these proceedings, and the Trustee's lien search yields none. (*See* Dkt. # 31, Appendix 1 to the *Trustee's Memorandum of Law in Response to Defendant's Motion for Summary Judgment or Partial Summary Judgment and in Support of Trustee's Cross Motion for Summary Judgment*).

When the Debtor and the Defendant Victoria Howard divorced in 1998, they executed a *Property and Settlement Agreement*, which was filed with and approved by the Circuit Court of Monogalia County, West Virginia. (*See* Dkt. # 31, Exhibit K).

A provision of the *Property and Settlement Agreement* states that "[a]ll of Victoria Marie Howard's interest in real estate holdings" were to be conveyed to the Debtor, excluding her interest in "the Florida home in Boca Raton, Florida ..." (*See* Dkt. # 31, Exhibit K, ¶ TWELFTH). The *Property and Settlement Agreement* further provided that the Debtor and Victoria Howard mutually remised, released and forever discharged each other from "any and all actions, suits, debts, claims, demands and obligations whatsoever, both in law or in equity, ... it being the intention of the parties ... that there shall be, as between them, only such rights and obligations as are specifically provided in this agreement." (*Id.* at ¶ EIGHTEENTH). In connection with the execution and approval of the *Property and Settlement Agreement* by and between the Debtor and Ms. Victoria Howard, Ms. Howard also deeded her Greene County real estate interests, if any, to John W. Howard and that deed was recorded in

Greene County, Pennsylvania on September 23, 1998. (*See* Dkt. # 31, Exhibit G).

Subsequent to the filing of the instant bankruptcy case and the appointment of the bankruptcy Trustee, the Defendant exercised control of the Mineral Rights on August 12, 2008 by executing a "Paid Up Oil and Gas Lease," (the "Oil & Gas Lease"), and she did so without the consent of the Trustee and without first obtaining approval of this Court. The Oil & Gas Lease entered into by the Defendant granted the right to explore and develop the Mineral Rights to an entity known as J.J. Oil & Gas Incorporated in exchange for various payments and other consideration. (*See* Dkt. # 52, Exhibit E). The Oil & Gas Lease was then recorded in Greene County, Pennsylvania, on October 2, 2008. *Id.*

After the execution of the Oil & Gas Lease, the Debtor and Defendant also recorded a Quit Claim Deed concerning the Mineral Rights in Greene County, Pennsylvania on August 25, 2008. (Dkt. # 31, Exhibit A). Again, this transaction was done subsequent to the commencement of this bankruptcy case, in-fact approximately four months thereafter, and was effectuated without the consent of the Trustee and without prior approval of this Court.

This Quit Claim Deed purported to transfer all "title and interest in the mineral rights, oil and gas and coal underlying that certain tract of land situate in Whitley Township, Greene County, Pennsylvania ..." to the Defendant. *See Id.* Attached to the Deed was a handwritten agreement allegedly executed by the Debtor and Victoria Howard on December 20, 1990, (the "1990 Agreement"), which states in pertinent part the Defendant "will retain all coal, gas and oil rights, even if the farm is sold or the marriage ends in divorce."

(*See* Dkt. # 27, Exhibit A).[4]

On March 5, 2009, after learning what had transpired, the Trustee initiated this Adversary Proceeding by filing a *Complaint to Recover Fraudulent Transfer* against the Defendant pursuant to 11 U.S.C. §§ 362, 542, 544, 549 and 550 of Bankruptcy Code, Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure, and the Pennsylvania Uniform Fraudulent Transfer Act of 12 Pa.C.S.A. §§ 5101–5110. (*See* Dkt. # 1, ¶ 5).

In response, the Defendant filed an *Answer* and an *Amended Answer* to the Complaint as well as a *Motion for Summary Judgment*. (*See* Dkt. # s 10, 24, 26). The Trustee countered by filing a *Response to the Defendant's Motion for Summary Judgment or Partial Summary Judgment and Cross–Motion for Summary Judgment.* (*See* Dkt. # 30).

A hearing was held October 27, 2009 and, following the hearing, two Orders were entered. (Dkt. # s 33, 35). The first Order required the Defendant to file, "a complete and accurate accounting … with respect to the receipt and disposition of any and all proceeds" received in exchange for any of the Mineral Rights. *See* (Dkt.# 35). The second Order required the Defendant to file a response to the Trustee's *Cross–Motion for Summary Judgment* and advised the parties the Court may decide the matter without further hearing. (*See* Dkt. # 33).

After complying with the first Order by filing several Preliminary and Amended "Accounting" items, (*see* Dkt. # s 34, 42 and 46), the Defendant filed a Response to the Trustee's *Cross–Motion* and a *Brief In Support of Defendant's Motion for Summary Judgment and in Opposition to Trustee's Cross–Motion for Summary Judgment* on November 17, 2009. (Dkt.# 52). Pursuant to its second Order of October 27, 2009 this Court took the matter under advisement.

After the Court took this matter under advisement, the Trustee filed an expedited *Motion for Order Requiring Defendant to Escrow Disputed Funds.* (Dkt.# 48). Pursuant to the *Motion for Order Requiring Defendant to Escrow Disputed Funds,* the Trustee requested that the Oil & Gas Lease proceeds that are in the possession of the Defendant, which now exceed $471,000,[5] be placed into immediate escrow as a result of Victoria Howard's continued dissipation of such funds. The Defendant opposed the *Motion for Order Requiring Defendant to Escrow Disputed Funds,* and a hearing was held on the motion on December 1, 2009.

After considering arguments of counsel and the record made in these proceedings, the Court issued a bench order at the December 1, 2009 hearing, which directed that all of the proceeds of the Oil & Gas Lease be immediately turned over to the Trustee pursuant to 11 U.S.C. § § 362(a) and 542. The Court's bench order also granted, in part, the Trustee's *Cross Motion for Summary Judgment* and denied the Defendant's *Motion for Summary Judgment.* While the Court set forth in detail its findings and conclusions supporting its two bench orders at the December 1, 2009 hearing, the Court also advised the

---

4. The original "1990 Agreement" has yet to be produced to the Trustee and the Court. The Trustee has questioned its authenticity and effectiveness. Nevertheless, for purposes of this Memorandum Opinion only, the Court has assumed for argument sake that the "1990 Agreement" is authentic.

5. Ms. Howard had received in excess of $600,000 on account of the Oil & Gas Lease; but she dissipated at least approximately $129,000 of those proceeds according to the accounting she filed with the Court. (Dkt. ## 's 46 and 47).

parties that this Memorandum Opinion would follow. This Memorandum Opinion therefore supplements the findings and conclusions stated by the Court on the record at the December 1, 2009 hearing.

## II.

This Adversary Proceeding is a "core" proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A),(E),(H), and (O). This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b).

## III.

The grant of summary judgment in adversary proceedings is controlled by Federal Rule of Bankruptcy Procedure 7056, which incorporates Rule 56 of the Federal Rules of Civil Procedure. Fed.R.Bankr.P. 7056. When faced with cross-motions for summary judgment, a court may not grant either motion, "unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed." *Manetas v. International Petroleum Carriers, Inc.*, 541 F.2d 408, 413 (3d Cir.1976) (*citing Rains v. Cascade Industries, Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). Additionally, the party proffering the motion under consideration bears "the burden of demonstrating that there is no genuine issue of fact." *Id.* (*citing Kress, Dunlap & Lane, Ltd. v. Downing*, 286 F.2d 212, 214 (3d Cir.1960)).

In considering a motion for summary judgment, the Court may rely upon the contents of the pleadings, the discovery and disclosure materials on file, and any affidavits. *See* Fed.R.Bankr.P. 7056(c). In so doing, courts are required to "resolv[e] all reasonable inferences against the party whose motion is under consideration." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed.Cir.2001) (*citing McKay v. United States*, 199 F.3d 1376, 1380 (Fed.

Cir.1999)). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party" a grant of summary judgment will be appropriate. *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir.2009) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

With these standards in mind, the Court concludes that there is no material issue of fact with respect to the facts identified in Part I of this Memorandum Opinion. With these facts not being subject to material dispute, it appears that the Trustee is entitled to summary judgment which (a) declares by operation of 11 U.S.C. § 544 that the Trustee's interest in the Mineral Rights, including any proceeds of the same, is superior than any interest claimed by the Defendant; (b) determines that the interest claimed by the Defendant, Victoria M. Howard, in the Mineral Rights or its proceeds is void under applicable non-bankruptcy law; (c) determines that Ms. Howard's "acquisition" of an alleged interest in the Mineral Rights by way of quit claim deed filed subsequent to the commencement of this bankruptcy case is void as being a willful violation of the automatic stay (11 U.S.C. § 362(a)) and as being an unauthorized post-petition transfer (11 U.S.C. § 549); (d) directs that the Defendant turnover to the Chapter 7 Trustee all proceeds the Defendant received with respect to the Mineral Rights pursuant to 11 U.S.C. §§ 541, 542 and 550; (e) determines that the Defendant is liable for all proceeds of the Mineral Rights that she dissipated; and (f) denies the *Motion for Summary Judgment* filed by the Defendant.

## A.

Section 544 of the Bankruptcy Code states, in pertinent part, as follows:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by

. . .

(3) a bona fide purchaser of real property . . . from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case.

11 U.S.C. § 544(a)(3).

■ By standing in the position of a hypothetical bona fide purchaser, the Trustee is "deemed to have conducted a title search of the property, paid value for the property, and perfected his/her interest as of the date of commencement of the case." *In re Speer*, 328 B.R. 699, 703 (Bankr.W.D.Pa.2005) (*citing In re Sosnowski*, 314 B.R. 23 (Bankr.D.Del.2004)).

■ Under these provisions of 11 U.S.C. § 544, a trustee is empowered to avoid any transfer, lien or encumbrance over which a bona fide purchaser would prevail. *Midlantic Nat'l Bank v. Bridge (In re Bridge)*, 18 F.3d 195, 199–200 (3d Cir.1994).

■ Courts within the Third Circuit have consistently held that the scope of this "strong arm" power under § 544 is "governed entirely by the substantive law of the state in which the property in question is located as of the bankruptcy petition's filing." *Id.* at 200 (citing *McCannon v. Marston*, 679 F.2d 13, 14 (3d Cir.1982)); *see also Deutsche Bank Nat'l Trust Co. v. Evans*, 2:09cv11, 2009 WL 2496926, *7, 2009 U.S. Dist. LEXIS 71555, *19 (W.D.Pa. Aug. 13, 2009); *In re Aulicino*, 400 B.R. 175, 181 (Bankr.E.D.Pa.2008).

From the record in this case, it is clear that all of the Mineral Rights at issue are located in Greene County, Pennsylvania. Therefore, this Court must look to Pennsylvania law.

■ Pennsylvania courts have consistently held transfers in mineral, oil and gas rights are considered transfers of real property. *Duquesne Natural Gas Co. v. Fefolt*, 203 Pa.Super. 102, 198 A.2d 608, 610 (Pa.Super.Ct.1964) (*citing* 24 P.L.E. Mining; Oil and Gas § 11, page 144). As such, any mineral, oil or gas rights, such as those under consideration in the case at bar, are "statutorily required to be recorded." *Lesnick v. Chartiers Natural Gas Co.*, 889 A.2d 1282, 1284–85 (Pa.Super.Ct.2005) (*citing In re Correction of Official Records with Civil Action. Appeal of Energy Explorations*, 44 Pa.Cmwlth. 511, 404 A.2d 741, 742 (Pa.Commw.1979)).

■ Under Pennsylvania law, for a person to attain the status of a bona fide purchaser of real property, the person must have acquired the property "without actual or constructive notice of a prior interest in the property." *Wagner v. Christiana Bank & Trust Co. (In re Wagner)*, 353 B.R. 106, 115 (Bankr.W.D.Pa. 2006) (*citing* 21 P.S. §§ 351, 357; 16 P.S. § 9853).

Applying these provisions to the facts of record, this Court concludes that the Trustee may only avoid a transfer in the Mineral Rights if she did not have actual or constructive notice of the Defendant's alleged interest prior to the "time of the commencement of the case." 11 U.S.C. § 544.

■ By admitting that the "1990 Agreement" was not recorded until August 25, 2008, the Defendant apparently concedes that any subsequent purchaser of the Mineral Rights could not have had notice of Victoria Howard's purported interest in

the Mineral Rights as of the commencement of this bankruptcy case. Indeed, the Defendant has not alleged, let alone cited any evidence pointing to, any fact or instance that would place the Trustee as of the petition date on inquiry notice of any alleged interest by the Defendant in the Mineral Rights. As such, it is indisputable that the Trustee occupies the position of a bona fide purchaser and may exercise the "strong arm" powers set forth in 11 U.S.C. § 544. *See In re Capital Center Equities,* 137 B.R. 600, 610 (Bankr.E.D.Pa.1992)(collecting cases addressing the strong arm powers of bankruptcy trustee and the trustee's right to avoid unrecorded interests when the trustee is not on inquiry notice of the claimed inchoate interest); *see also In re Brown,* 37 B.R. 516 (Bankr.E.D.Mo. 1984) (trustee may avoid under "strong arm" powers of Section 544(a)(3) interest in property that was unrecorded as of the commencement of the bankruptcy case) and *In re Fisher,* 320 B.R. 52 (E.D.Pa.2005)(discussing avoidance powers in the context of an unrecorded or defective mortgage).

■ In her brief, the Trustee lists two additional reasons as to why she maintains a superior interest in the Mineral Rights vis-a-vis the Defendant. First, the Trustee asserts she may disregard the "1990 Agreement" cited by the Defendant as being void because (a) the alleged agreement was not recorded as required by Pennsylvania law pursuant to 21 P.S. §§ 351 and 356, and (b) the document at issue was allegedly executed outside the state of Pennsylvania and was not recorded within six months from the date of execution as required by 21 P.S. § 445. (*See* Dkt. # 30, ¶¶ 11–12). Second, the Trustee points to the 1998 *Property and Settlement Agreement,* which divests the Defendant of "all her interests in the property ..." (*See*

Dkt. # 30, ¶ 13). The Court finds the Trustee's arguments to be persuasive.

In defense to the Trustee's assertion that the "1990 Agreement" is void, the Defendant attacks the Trustee's reliance on 21 P.S. § 356, which requires the recording of "[a]ll agreements in writing relating to real property situate in this Commonwealth". 21 P.S. § 356. In this regard, the Defendant avers that the Trustee is incorrect in assuming the recording statute of § 356 "renders unrecorded actions void." (*See* Dkt. # 52, p. 6).

The Defendant, however, ignores the legal effect of 21 P.S. § 351, which provides any unrecorded writing concerning a conveyance of an interest in land, "shall be adjudged fraudulent and void as to any subsequent bona fide purchaser." 21 P.S. § 351.

Further, the Court notes that, pursuant to 21 P.S. § 445 all deeds and conveyances made and/or executed outside the Commonwealth with respect to Pennsylvania real property must be recorded in Pennsylvania "within the space of six months from the execution thereof." 21 P.S. § 445. Pennsylvania law further provides that any such deeds or conveyances not timely recorded "shall be adjudged fraudulent and void against any subsequent purchaser ..." *Id.* The Defendant nonetheless ignores the undisputed fact that the "1990 Agreement" was executed in Florida and was not recorded until August 25, 2008, which was well after the bankruptcy petition date and approximately eighteen (18) years from its alleged execution. (*See* Dkt. # 52, Exhibit G at p. 11, and Dkt. # 52, Exhibit F).

Thus, it appears that the "1990 Agreement" is void by operation of *both* 21 P.S. § 351 and 21 P.S. § 445. With the "1990 Agreement" being void as a matter of law, the Trustee (and the bankruptcy estate

which she represents) is simply not subject to its terms by operation of these statutes and 11 U.S.C. § 544(a)(3).

The Court also notes that the plain language of 21 P.S. § 445 voids a conveyance not timely recorded as to any "subsequent purchaser ... for valuable consideration." Because the transaction embodied by the "1990 Agreement" does not meet the recording requirements of Section 445, it appears that any purchaser for valuable consideration is protected, not just a bona fide purchaser. This statute further states that the failure to timely record the conveyance also renders the transaction void as to creditors of the grantor. Because the plain language of the Bankruptcy Code—found at 11 U.S.C. §§ 544(a)(1) and (a)(2)—empowers the Trustee with the powers of a hypothetical judicial lien creditor and/or execution creditor as of the commencement of the case, this Court concludes that the "1990 Agreement" is voidable pursuant to Sections 544(a)(1) and (a)(2) as well. The alleged agreement is further avoidable pursuant to 11 U.S.C. § 544(b)(1), which states that the "trustee may avoid any transfer of an interest of the debtor ... that is voidable under applicable law by a creditor holding an unsecured claim ..." [6]

## B.

Given the clear application of 11 U.S.C. § 544, Ms. Victoria Howard alleges that she maintains an undivided one-half interest in the Mineral Rights even if the Trustee is a hypothetical bona fide purchaser.[7]

The argument of the Defendant is not entirely clear in this regard. But, a fair reading of the Defendant's pleadings reveals that the Defendant is contending that because the Mineral Rights were re-deeded to the Debtor after Ms. Howard's marriage to the Debtor, Ms. Howard now allegedly holds (as of the bankruptcy petition date) an interest in the Mineral Rights as tenants in common with the Debtor. Ms. Howard's argument is without merit.

As an initial matter, the suggestion that Victoria Howard obtained a marital interest in the Mineral Rights is suspect on its face. The concept of marital property under Pennsylvania law expressly excludes property acquired prior to marriage, *see* 23 Pa.C.S. A. § 3501(a), and the undisputed record in this case is that John W. Howard owned the Mineral Rights prior to his marriage to Defendant.[8] Nothing in the record reflects that by re-deeding the Mineral Rights to himself that John W. How-

---

**6.** The claims docket and/or register reflects that at least 41 claims have been filed by creditors against the bankruptcy estate of John W. Howard at Case No. 08–22224–JAD. Those claims aggregate in excess of $12.7 million.

**7.** The Defendant contends that she had an entireties interest in the Mineral Rights; but nothing has been filed by the Defendant reflecting that the Mineral Rights were conveyed to her and Mr. Howard as husband and wife. As such, Ms. Howard cannot be said to have an entireties interest in any of the real property interests at issue.

**8.** It is of no moment that John W. Howard previously owned the Mineral Rights as ten-

ants-by-entireties with his prior wife, Peggy Howard. The fact remains that he always owned a 100% interest in the Mineral Rights. *See In re Brannon,* 476 F.3d 170 (3d Cir.2007)(discussing entireties property, and the fact that each spouse is deemed to own the whole, or entire estate). The Court would also note that the Defendant has not alleged that the Mineral Rights constitute marital property as a result of any increase in value during her marriage with John W. Howard. *See* 23 Pa.C.S. A. § 3501(a). In any event, any such claims by Defendant were waived as a part of the *Property and Settlement Agreement.* (*See Property and Settlement Agreement* at ¶¶ TWELFTH and EIGHTEENTH).

ard gifted the Mineral Rights to his marital estate with Victoria Howard in 1989. Had he wanted to donate the property to his marital estate, Mr. Howard should have identified Victoria Howard as a grantee. *See e.g. Brown v. Brown,* 352 Pa.Super. 267, 507 A.2d 1223 (1986). The record, however, reflects otherwise because the 1989 deed identifies John W. Howard as the only grantee.

Even if the Mineral Rights constituted some sort of marital property by operation of the 1989 re-deeding to John W. Howard, this result would not change or diminish the Trustee's strong arm powers. The Court reaches this conclusion because the fact that an asset constitutes marital property does not necessarily mean that a spouse's claim for equitable distribution trumps the interest of a bankruptcy trustee under the unique facts and circumstances of this case.[9]

The Court reaches this conclusion because the *Property and Settlement Agreement* entered into by and between the Debtor and Ms. Howard in 1998 unequivocally provided that Ms. Howard agreed to convey to the Debtor "all of her right, title and interest in ... [a]ll of Victoria Maria Howard's interest in real estate holdings,

..." As the phrase "all ... interest in real estate holdings" is clear and unambiguous, the Court sees no reason to resort to extrinsic evidence to interpret the *Property and Settlement Agreement. McMahon v. McMahon,* 417 Pa.Super. 592, 612 A.2d 1360, 1364 (Pa.Super.Ct.1992) ("The Court must construe the contract only as written and may not modify the plain meaning of the words under the guise of interpretation.") (*citing Trumpp v. Trumpp,* 351 Pa.Super. 205, 505 A.2d 601 (1985); *Bohler–Uddeholm America, Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 93 (3d Cir.2001)) ("A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract."); *see also Perry v. Sonic Graphic Systems, Inc.,* 94 F.Supp.2d 616, 620 (E.D.Pa.2000) ("Under Pennsylvania law, when a party argues that a contract contains an ambiguity, that party must be able to point to a reasonable alternative interpretation for the ambiguity") (*citing Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1012 n. 13 (3d Cir.1980)).[10]

---

**9.** As of the commencement of the Debtor's bankruptcy case, the Defendant had no judgment for equitable distribution of the Mineral Rights. Some courts have held that the failure of the non-debtor spouse to obtain a judgment for equitable distribution renders that spouse's claim as being purely an unsecured claim against the bankruptcy estate. *See Polliard v. Polliard (In re Polliard),* 152 B.R. 51 (Bankr.W.D.Pa.1993)(Bentz, J.). Other courts have reached the opposite conclusion, holding that the non-debtor spouse holds some sort of interest in the subject property if it constitutes "marital property" under applicable non-bankruptcy law. *In re Bennett,* 175 B.R. 181 (Bankr.E.D.Pa.1994)(Sigmund, J.). This Court, however, need not address this thorny issue because the *Property and Settlement Agreement,* which was approved by the

West Virginia state court, provides that the real property is the Debtor's.

**10.** The Court rejects the notion that somehow the deed referenced in the *Property and Settlement Agreement* constitutes evidence that the Mineral Rights were reserved for Victoria Howard. Had Ms. Howard desired to retain whatever interest she had in the Mineral Rights (if any), she would have (and should have) clearly delineated such retained property in the same fashion as she did with respect to the "Florida home" as set forth in the Twelfth Paragraph of the *Property and Settlement Agreement,* and expressly provided for an exception and reservation set forth in the deed. *See* (Dkt. # 31, Exhibit G, pp. "186–87"). *See Delaware & H. Canal Co. v. Hughes,* 183 Pa. 66, 38 A. 568, 569 (1897) (Under Pennsylvania law, "[s]o long as mineral de-

By her pleadings and briefs, it also appears that Victoria Howard is attempting to somehow re-visit her alleged claim of equitable distribution of the Mineral Rights. Any such effort is barred because The *Property and Settlement Agreement* further provides that the Debtor and Victoria Howard mutually remised, released and forever discharged each other from "any and all actions, suits, debts, claims, demands and obligations whatsoever, both in law or in equity, . . . it being the intention of the parties . . . that there shall be, as between them, only such rights and obligations as are specifically provided in this agreement." (*Id.* at ¶ EIGHTEENTH).

Confining the Court's analysis to the express language within the four corners of the *Property and Settlement Agreement,* this Court finds that the Defendant ceded *all* marital interests the Defendant may have acquired in the Mineral Rights back to the Debtor in 1998.[11]

## C.

■ In granting the Trustee summary judgment, this Court recognizes that a Quit Claim Deed was ultimately executed and recorded in August of 2008 in favor of Victoria Howard. However, this conveyance may be voided by the Trustee under applicable law as being an *ultra vires* act that violated the automatic stay.

The facts set forth above, and which are not subject to reasonable dispute, reveal that the Mineral Rights are property of the estate. *See* 11 U.S.C. § 541. The execution, acceptance of delivery, and recording of the Quit Claim Deed are acts to effectuate the transfer of property of the estate and constitute acts "to obtain possession of property of the estate" or to "exercise control over property of the estate" proscribed by 11 U.S.C. § 362(a)(3). Because these acts violate the automatic stay, the purported transaction upon which the Defendant Victoria Howard relies may be invalidated by the Trustee. *In re Oxford Royal Mushroom Products, Inc.,* 39 B.R. 948, 949 (Bankr.E.D.Pa.1984) (*citing Kalb v. Feuerstein,* 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940)).

## D.

■ There exists another reason why the Quit Claim Deed is of no effect in this bankruptcy case. The execution, delivery and recording of the Quit Claim Deed is a post-petition transaction which is voidable by the Trustee pursuant to 11 U.S.C. § 549. The transfer is void because it occurred after the commencement of the case and was not authorized under title 11 of the United States Code or by an order of this Court. *See* 11 U.S.C. § 549.

## E.

■ Section 550(a) of the Bankruptcy Code provides that the "trustee may recover, for the benefit of the estate, the property transferred or, if the court so orders, the value of such property" from

---

posits remain in place they are part of the freehold, and pass with it by deed, gift or other form of conveyance . . ."); *see Moreland v. H.C. Frick Coke Co.,* 170 Pa. 33, 32 A. 634, 635 (1895)(pursuant to Pennsylvania law, title to the surface of the land will include the mineral rights beneath it, unless those rights have been severed). Victoria Howard, however, did neither in this case.

11. The record in this bankruptcy case is consistent with the fact that the Defendant ceded all of her alleged interests in the Mineral Rights to the Debtor. For instance, the bankruptcy case record reflects that Debtor John W. Howard entered into an Oil and Gas Lease with Atlas America, LLC on February 23, 2007, and he identified this lease at Schedule G which was filed under penalty of perjury. (*See* Dkt. # 75, *Schedule G* (*and related attachments* ), Case No. 08–22224–JAD).

the initial transferee. 11 U.S.C. § 550(a)(1). It appears appropriate that pursuant to this section of the Bankruptcy Code that the Mineral Rights be returned to the Trustee as the representative of the bankruptcy estate. Consequently, a judgment will be entered that voids the purported transfer of the Mineral Rights to the Defendant and returns them to the Trustee.

■ In addition, the Bankruptcy Code expressly provides that any property obtained by the Trustee pursuant to 11 U.S.C. § 550 "becomes part of the estate." 11 U.S.C. § 541(a)(3); *see also In re Elin,* 20 B.R. 1012, 1017 (D.N.J.1982) (*citing* Weintraub and Resnick, *Bankruptcy Law Manual* pp. 4–11 (Warren, Gorham & Lamont 1980)). With the Mineral Rights constituting property of the estate, 11 U.S.C. § 541(a)(6) also provides that "property of the estate" explicitly includes "[p]roceeds, product, offspring, rents or profits of or from property of the estate." 11 U.S.C. § 541(a)(6). By operation of this statute, it is apparent that the Oil & Gas Lease, and any payments received or to be received thereon, constitutes property of the estate. As such, pursuant to 11 U.S.C. § 542, an order shall be entered which directs that the Defendant "shall deliver to the trustee, and account for, such property...." *See* 11 U.S.C. § 542(a).

Not to be forgotten, the Court would also note that Victoria Howard has already expended approximately at least $129,000 of the Oil & Gas Lease monies. Ms. Howard will be liable for her dissipation of such funds, and further proceedings will be scheduled to establish exactly the amount of her liability in this regard.

## F.

11 U.S.C. § 362(k) provides that an individual injured by any willful violation of a stay is entitled to recover actual damages, which include costs and attorney's fees, and may recover punitive damages. 11 U.S.C. § 362(k).[12] The Trustee asserts she is entitled to actual and punitive damages, including attorney's fees, because the Defendant's conduct violated the automatic stay. *See* (Dkt. # 31 at p. 16). The Trustee's rationale posits that because the Defendant did not maintain any interests in the Mineral Rights, the Defendant "knowingly obtained property rightfully belonging to (the Debtor's) bankruptcy estate." *Id.*

■ It is undisputed that the Defendant knew of the Debtor's bankruptcy filing when all of the post-petition stay violations occurred because she filed a proof of claim in the Debtor's main case on May 27, 2008. *See* (Claim # 5, Case No. 08–22224JAD). This Court has previously held that to satisfy the willfulness requirement for purposes of Section 362(k), the plaintiff does not have to prove that the defendant intended his or her conduct to violate the automatic stay. But rather all that the plaintiff must prove is that the act which violates the stay was intentional. *In re Wingard,* 382 B.R. 892, 901 (Bankr. W.D.Pa.2008) (*citing In re Lansdale Family Restaurants, Inc.,* 977 F.2d 826, 829 (3d Cir.1992)).

■ Courts have also consistently held, "[w]hether the party believes in good faith that it had a right to the property is not relevant to whether the act was willful or whether compensation must be awarded." *Weisberger v. United States, IRS (In re Weisberger),* 205 B.R. 727, 731 (Bankr.

---

**12.** *See also Cuffee v. Atlantic Business and Comm. Dev. Corp. (In re Atlantic Business ),* 901 F.2d 325, 329 (3d Cir.1990)(where chapter 11 bankruptcy trustee successfully obtained money damages against defendant for a willful violation of the automatic stay).

M.D.Pa.1997) (*citing In re University Medical Center*, 973 F.2d 1065, 1088 (3d Cir.1992)).

██ In the case before this Court, there is no dispute that the Defendant (by exercising control over the Mineral Rights by entering the into the Oil & Gas Lease, and by attempting to obtain an interest in the Mineral Rights by recording the Quit Claim Deed) has committed a willful violation of the stay. Application of 11 U.S.C. § 362(k) to this case is therefore appropriate.

██ However, the record is not established enough at this time to establish the amount of Section 362(k) damages to be assessed in this case against Victoria Howard. Specifically, the Trustee has not specified either the attorneys' fees or costs she has incurred or the nature or amount of any actual damages that should be awarded (above and beyond any shortfall with respect to the return of the Mineral Right's proceeds); nor is the record adequately developed at this time for the Court to determine the amount of punitive damages, if any, that should be awarded in this case.

Under these circumstances, the Court will grant summary judgment to the extent of finding the Defendant committed a willful violation of the automatic stay, but will not yet address the amount of damages to be assessed against the Defendant, Victoria Howard. A trial on this limited issue will be set.

## IV.

For all of the reasons set forth above, the Court concludes that there is no material issue of fact with respect to the facts identified in Part I of this Memorandum Opinion. With these facts not being subject to material dispute, the Court concludes that the Trustee is entitled to summary judgment which (a) declares that the Trustee's interest in the Mineral Rights, including any proceeds of the same, is superior to any interest claimed by the Defendant; (b) determines that the interest claimed by the Defendant, Victoria M. Howard, in the Mineral Rights or its proceeds is void under applicable non-bankruptcy law; (c) determines that Ms. Howard's "acquisition" of an alleged interest in the Mineral Rights by way of quit claim deed filed subsequent to the commencement of this bankruptcy case is void as being a willful violation of the automatic stay (11 U.S.C. § 362(a)) and as being an unauthorized post-petition transfer (11 U.S.C. § 549); (d) directs that the Defendant turnover to the Chapter 7 Trustee all proceeds the Defendant received with respect to the Mineral Rights pursuant to 11 U.S.C. §§ 541, 542 and 550; (e) determines that the Defendant is liable for her willful violation of the automatic stay and is liable for all proceeds of the Mineral Rights that she dissipated; and (f) denies the *Motion for Summary Judgment* filed by the Defendant. The Court also concludes that the Trustee is not entitled to summary judgment as to the precise amount of further damages for which Defendant Victoria is liable, as the record in this area is not developed enough to warrant the entry of summary judgment in this regard. A trial will be scheduled on this limited issue. An appropriate Order will be entered.

## *ORDER*

**AND NOW**, this 10th day of December, 2009, and for the reasons stated in the accompanying Memorandum Opinion of this even date, the Court hereby ORDERS, ADJUDGES and DECREES as follows:

    A.   The Defendant's *Motion for Summary Judgment or Partial Sum-*

*mary Judgment* is **DENIED** in all respects.

B. The Trustee's/Plaintiff's *Cross Motion for Summary Judgment* is **GRANTED IN PART.** Specifically, partial summary judgment is entered in favor of the Plaintiff and against the Defendant as follows:

1. By operation of 11 U.S.C. § 544, the Trustee's/Plaintiff's interest with respect to certain mineral rights, including oil, gas and coal, underlying that certain tract of land situate in Whitley Township, Greene County, Pennsylvania and described more fully in the property description set forth in the Quit Claim Deed annexed to this Order at Appendix 1 (collectively, the "Mineral Rights"), including any proceeds of the same, is superior to any interest claimed by the Defendant Victoria M. Howard.

2. The Mineral Rights and any proceeds relating to the same constitute property of this bankruptcy estate pursuant to 11 U.S.C. § 541.

3. The interest claimed by the Defendant, Victoria M. Howard, in the Mineral Rights and its proceeds is void under applicable non-bankruptcy law.

4. Defendant Victoria Howard's "acquisition" of an alleged interest in the Mineral Rights by way of quit claim deed filed subsequent to the commencement of this bankruptcy case is void as being a willful violation of the automatic stay (11 U.S.C. § 362(a)) and as being an unauthorized post-petition transfer (11 U.S.C. § 549).

5. Pursuant to 11 U.S.C. §§ 541, 542 and 550, the Defendant Victoria Howard is directed to turnover to the Chapter 7 Trustee, Carlota M. Bohm, all proceeds the Defendant received with respect to the Mineral Rights, including without limitation all proceeds she received with respect to the oil and gas lease attached hereto as Appendix 2. Said turnover shall be completed immediately. To the extent the Defendant, Victoria M. Howard, receives any proceeds of the Mineral Rights in the future, said proceeds shall be held in trust for the benefit of this bankruptcy estate and be immediately turned over to the Carlota M. Bohm as Chapter 7 Trustee.

6. The Defendant Victoria M. Howard is determined to be liable to the bankruptcy estate (a) for all proceeds of the Mineral Rights that the Defendant has dissipated and has not turned over to the Plaintiff/Trustee, and (b) for the Defendant's willful violation of the automatic stay.

D. To the extent that the Chapter 7 Trustee deems it appropriate, the Chapter 7 Trustee is authorized to record a copy of this Order (along with its attachments) with the Recorder of Deeds of Green County, Pennsylvania and any other state or local office where documents affecting the chain of title may be filed.

E. The Trustee's/Plaintiff's *Cross Motion for Summary Judgment* is **IN PART DENIED WITHOUT PREJUDICE** with respect to the establishment of the exact amount of further compensatory damages and/or punitive damages which may be assessed against the Defendant Victoria M. Howard. A trial will be scheduled separately on this limited issue.

## Appendix 1

Sted By: ews  11/21/2008

BK0395 PG0980

**QUIT CLAIM DEED**

200800004126
Filed for Record in
GREENE COUNTY, PA
THOMAS M HEADLEE
08-25-2008 At 02:54 pm.
DEED        38.50
OR Book  395 Page  980 -  982-A-B

# THIS DEED

*MADE* the .......25TH....... day of ......August....................................................... in the

year Two Thousand and Seven (2008).:........................................................................................

*BETWEEN*  JOHN W. HOWARD of Waynesburg, Greene County, Pennsylvania,

grantor, and

VICTORIA HOWARD of 5140-1 Sabal Gardens Lane, Boca Raton, FL 33487,

grantee;

*WITNESSETH*, that in consideration of the sum of One Dollar ($1.00), the receipt

whereof is hereby acknowledged, said Grantor does hereby remise, release and quit claim, grant

and convey unto the said Grantee:

ALL his right, title and interest in the mineral rights, oil and gas and coal underlying that

certain tract of land situate in Whitley Township, Greene County, Pennsylvania, more fully

described and bounded in the deed from Herman A. Hylkema and Juanita L. Hylkema, his wife

dated April 5, 1984 and recorded in the Office at Deed Book Volume 673, page 327, to Grantee,

in full satisfaction of the contract agreement of December 20, 1990 a copy of which is attached

hereto, made a part hereof and marked Exhibit "A"

Also this is the same tract of land described in the deed dated December 29, 1989 from

John W. Howard and Peggy J. Howard, formerly husband and wife, to John W. Howard and

recorded June 5, 1990 in the Office of the Recorder of Deeds for Greene County, Pennsylvania in

Record Book Volume 79, page, 185.

EXHIBIT
A

586

Filed By: ews 11/21/2008

BK0395 PG0981

This is a Quit Claim deed for mineral oil and gas rights and is not subject to transfer tax

and is a settlement between husband and wife, and dated December 20, 1990

And the said grantor will quit claim the property hereby conveyed.

08/21/2008, 17:57  551--36.  99  BK0395 PG0982  KINKO'S  10"  PAGE 01

This agreement, made, this 20th day of December 1990, by and between Victoria M. Howard, (wife), and John W. Howard (husband).

Pertaining to the farm they own in Whitley Twsp., Greene County; Victoria will retain all coal, gas and oil rights, even if the farm is sold or the marriage ends in divorce.

Victoria M. Howard

*(signature)*

CAROLYN FUR...
NOTARY PUBLIC, STATE OF FLORIDA
MY COMMISSION EXP: MAR. 12, 1992
BONDED THRU GENERAL INS. UND.
PUBLIC

Carolyn Furst

Notary Public
My commission expires

EXHIBIT "A"

588

ated By: cvs - 11/21/2008

**BK0395 PG0982-1**

IN WITNESS WHEREOF, the said grantor has hereunto set his hand and seal, the day and year first above written..

Sealed and delivered

in presence of

..........................................................(Seal)

JOHN W. HOWARD

..................................................... .................................................(Seal)

NOTICE— Grantee (hereinafter, whether one or more, called "Grantee") hereby agrees that he may not be obtaining the right of protection against subsidence resulting from coal mining operations and that the purchased property may be protected from damage due to mine subsidence by a private contract with the owners of the economic interests in the coal. ATTEST:

_____     _____

                            _____

NOTICE— THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHT OF SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COMPLETE LEGAL RIGHT TO REMOVE ALL OF SUCH COAL AND, IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND, THE INCLUSION OF THIS NOTICE DOES NOT ENLARGE, RESTRICT OR MODIFY ANY LEGAL RIGHTS OR ESTATES OTHERWISE CREATED, TRANSFERRED, EXCEPTED OR RESERVED BY THIS INSTRUMENT. (This notice is set forth pursuant to Act No. 255, approved September 10, 1965.)

*State of Pennsylvania*
*County of Washington.........SS.*

On this, the **25** day of **Aug**., 2008            before me, John W. Howard
the undersigned officer, personally appeared

known to me (or satisfactorily proven) to be the person whose name is   subscribed,
to the within instrument, and acknowledged that she executed the same for the purposes therein contained.
In Witness Whereof, I hereunto set my hand and official seal.
                                    My Commission Expires.

589

0395 PG0982-6

Vested By: bws 11/21/2008

# DEED

From:
JOHN W. HOWARD
To
VICTORIA HOWARD

Dated Aug. 25 2008

Recorded at:

Parcel No:

Residence of Grantee is:
5740-1 Sable Garden lane
Boca Raton, Fla 33497

By: John W. McIlvaine, Esq.
33 West Beau Street
Washington PA 15301

I hereby CERTIFY that this document is recorded in the Recorder's Office of Greene County, Pennsylvania.

Thomas M Headlee
Recorder of Deeds

# Appendix 2

PRODUCERS 88 OIL AND GAS LEASE

## BK0397 PG1090

### PAID-UP

### OIL & GAS LEASE

Lease No. _____

400 - PA

This Lease made this 16th day of August, 2008, by and between: Victoria M. Howard, herein dealing with her sole and separate property, whose address is 5140-J Sabal Gardens, Boca Raton, FL 33487, is hereinafter collectively called "Lessor" J J OIL & GAS INCORPORATED, 106 Wallace Dr., McMurray, PA 15317, a Pennsylvania Corporation, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

**LEASING CLAUSE.** Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, coalseed mathane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

DESCRIPTION. The Leasehold is located in the Township of Whiteley, in the County of Greene, in the Commonwealth of Pennsylvania, and described as follows:

Property Tax Parcel Identification Number: 29-06-121-B,29-06-121

200800004787 ·
Filed for Record in
GREENE COUNTY, PA
THOMAS H HEADLEE
10-02-2008 At 10:57 am.
LEASE       20.50
OR Book  397 Page 1090 - 1093

and is bounded formerly or currently as follows:
On the North by lands of James Graham;
On the East by lands of Clinton Butcher ;
On the South by lands of Mona Counts;
On the West by lands of Hatfield;

including lands acquired from Mona M. Counts and John D. Yellors , by virtue of deed dated January 4th ,1996 , and recorded in Book 151 Page 13, and described for the purposes of this agreement as containing a total of 202.192 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

**LEASE TERM.** This Lease shall remain in force for a primary term of five (5) years from 12:00 A.M. 8/12/08 (effective date) to 11:59 P.M. 8/12/13 (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

**NO AUTOMATIC TERMINATION OR FORFEITURE.**

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

**PAYMENTS TO LESSOR.** In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay is Maturing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:
1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal fifteen (15) percent part of all oil and any constituents thereof produced and marketed from the Leasehold.
2. GAS: To pay Lessor an amount equal to fifteen (15) percent of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay In Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

EXHIBIT
B

BK0397 PG1091

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted a period of less than twelve months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or merchantable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other leasehold and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the revenue realized from the production of such unit, such proportional share of the Royalty form each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold lands) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well within 300 feet of any structure located on the Leasehold without Lessor's written consent. Lessee shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessee shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor a proportionate part for the estimated recoverable gas remaining in the well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, this Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the Lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon such surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable for breach of any provisions or implied covenants of this Lease when drilling, production or other operations are so prevented or delayed.

.. 

592

BK0397 PG1092

**SEVERABILITY:** If any provision of this Lease is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**COUNTERPARTS.** This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

**ANNUAL PAYMENT OF 300 MCF X $ SOLD IN LIEU OF FREE GAS.** If, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of the surface of the leased premises and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to three hundred thousand (300,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage in the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising therefrom or relating thereto. If Lessor in any year uses gas in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rate charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 300,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

**MARKET ENHANCEMENT CLAUSE.** It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessor's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

**NO STORAGE RIGHT CLAUSE.** Notwithstanding anything herein contained to the contrary, Lessee agrees the herein described leased premises shall not be used for the purpose of gas storage as defined by the Federal Energy Regulatory Commission. Any reference to gas storage contained in this lease is hereby deleted. If Lessor wishes to enter into an agreement regarding gas storage using the leased premises with a third party, Lessor shall first give Lessee written notice of the identity of the third party, the price or the consideration for which the third party is prepared to offer, the effective date and closing date of the transaction and any other information respecting the transaction which Lessee believes would be material to the exercise of the offering. Lessor does hereby grant Lessee the first option and right to purchase the gas storage rights by matching and tendering to the Lessor any third party's offering within 30 days of receipt of notice from Lessor.

**ASSIGNMENT CLAUSE.** Prior to any assignment of this lease or any rights thereunder Lessee agrees to notify Lessor of the name and address of the proposed assignee(s) and to obtain Lessor's prior written consent, which consent shall not be unreasonably withheld or delayed, provided that assignments of working interests to officers, directors and subsidiaries of Chesapeake Appalachia, L.L.C. and Dale Property Services Penn L.L.C. may be made without such consent so long as the aggregate working interest in this lease conveyed by all such assignments does not exceed a ten percent (10%) working interest. Every such assignment or sublease which shall be made without the written consent of Lessor first had and obtained shall be void, and although made with the written consent of Lessor, any such assignment or sublease shall, nevertheless, be void unless it also contains a limitation in favor of Lessor requiring that the written consent of Lessor must be obtained prior to any further assignment or subletting of the rights of Lessee hereunder.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Witness _____     _____ (Seal)

Witness _____     _____ (Seal)

Witness _____     _____ (Seal)

Witness _____     _____ (Seal)

Requested By: ... (illegible)

ACKNOWLEDGMENT

BK0397 PG1093

STATE OF _Pennsylvania_ }
} SS:
COUNTY OF _Washington_ }

On this the _12TH_ day of _August_ , 2008, before me, the undersigned authority, personally appeared _Victoria Howard_, who, being duly sworn according to law, depose and say that they executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _10-17-08_
Signature/Notary Public: _____
Name/Notary Public (print): _Zazuie J. Louis_

ACKNOWLEDGMENT

STATE OF _____ }
} SS:
COUNTY OF _____ }

On this the ____ day of _____, 2008, before me, the undersigned authority, personally appeared _____, who, being duly sworn according to law, depose and say that they executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

CORPORATE ACKNOWLEDGMENT

STATE OF _____ }
} SS:
COUNTY OF _____ }

On this the ____ day of _____, 2008, before me, the undersigned authority, personally appeared _____, who acknowledged himself to be the _____ of _____, and that he as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

I hereby CERTIFY that this document is recorded in the Recorder's Office of Greene County, Pennsylvania.

Thomas M. Headlee
Recorder of Deeds